UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BRADLEY A. GARDNER,

      Plaintiff,

vs.    Case No.  3:05-cv-555-J-MCR

JO ANNE B. BARNHART, Commissioner of
the Social Security Administration,

      Defendant.
_____/

**MEMORANDUM OPINION AND ORDER**

This cause is before the Court on Plaintiff's appeal of a final administrative decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits and Supplemental Security Income.[1]  The Court has thoroughly reviewed the record, the briefs, and the applicable law.  For the reasons set forth herein, the Commissioner's decision is **REVERSED** and the matter **REMANDED** for proceedings not inconsistent with this opinion.

**I.    PROCEDURAL HISTORY**

Plaintiff protectively filed an application for disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")  on November 21, 2002, alleging an inability to work since August 31, 2002.  (Tr. 55-57).  The Social Security Administration ("SSA") denied this application initially and on reconsideration. (Tr. 20-23).  Plaintiff then requested and received a hearing before an Administrative Law Judge (the "ALJ") on

---

[1] The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 13).

August 11, 2004. (Tr. 206-231). On February 10, 2005, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 8-19). On March 22, 2005, Plaintiff filed a Request for Review by the Appeals Council. (Tr. 6-7). The Appeals Council denied Plaintiff's request for review, thus making the ALJ's February 10, 2005 decision the final decision of the Commissioner. (Tr. 4-5). Plaintiff timely filed his Complaint in the U.S. District Court on June 17, 2005. (Doc. 1).

## II.    NATURE OF DISABILITY CLAIM

### A.    Basis of Claimed Disability

Plaintiff claims to be disabled since August 31, 2002, due to severe back pain and stiffness, inability to rotate his neck without extreme pain, and loss of spinal column function. (Tr. 60-69, 95-100).

### B.    Summary of Evidence Before the ALJ

Plaintiff was twenty-seven (27) years old with an 11th grade limited education at the time of the ALJ's decision. (Tr. 12). His past work experience includes employment as an environmental technician, truck driver, fence installer, roof installer, plumber helper, and pro surfer. (Tr. 12, 76-83).

Plaintiff claims to have been born with a disabling spinal birth defect. (Tr. 55). At the age of one year, he underwent a spinal fusion in his thoracic area. (Tr. 63). Despite his spinal defect, Plaintiff claims he was able to function and work up until August 31, 2002, at which time he was no longer able to meet the physical requirements of his environmental technician job. (Tr. 61). On August 28, 2002, immediately prior to his alleged disability date, Dr. Bruce A. Hartwig drafted a medical note opining Plaintiff

cannot work in the field or travel; however, there are no medical records from Dr. Hartwig in the record. (Tr. 205).

On November 14, 2002, Plaintiff underwent diagnostic radiological testing of his spine due to spinal stenosis at St. Vincents' Medical Center. (Tr. 199, 200). Dr. Michael Sharpe opined, after interpreting a Spine Lumbar AP and Lateral, as well as a Cervical AP and Lateral, that Plaintiff had scoliotic and developmental changes of mild bony spurring, posteriorly and anteriorly at C5-6 in the cervicothoracic junction, and cervicothoracic scoliosis. (Tr. 198-99). Dr. Sharpe also stated that earlier studies of Plaintiff would have been helpful to determine followup. Id. After interpreting a Spine Thoracic AP/Lat/Swimmers, Dr. Sharpe again noted significant scoliotic and developmental changes in the thoracic spine and questioned whether there was any possibility of neurofibromatosis. (Tr. 200). He noted that the findings of the exam were quite unusual. Id.

In December 2002, Plaintiff again underwent diagnostic radiological testing, this time of his brain and spine. (Tr. 184-189). A brain MRI showed mild right lateral disc protrusion and mild degenerative disc disease at the C5-6 and C6-7 levels. (Tr. 185). A CT of his Thoracic Spine showed moderate scoliosis and developmental changes. (Tr. 187-88).

On December 23, 2002, Plaintiff was evaluated at Lyerly Neurological Associates by Dr. Javier Garcia-Bengochea ("Dr. Garcia"). (Tr. 126-128). Dr. Garcia noted Plaintiff had been having pain in his posterior cervical region extending into his shoulders, spine, and left hip for approximately six years. (Tr. 126). He further noted Plaintiff complained of pain in both hands and both distal legs, and numbness in his legs. Id. Plaintiff told

Dr. Garcia his symptoms had worsened recently but that he was unsure of any exacerbating cause. Id. On evaluation Dr. Garcia noted "some tenderness to palpation over the sinus processes in the lower cervical spine which reproduces Plaintiff's pain and moderate thoracic scoliosis." (Tr. 127). Dr. Garcia further noted Plaintiff had diminished range of motion in flexion and extension in his neck and he was approximately 50% limited in all modalities of his cervical spine. Id. Otherwise, his exam was normal.

After an evaluation of Plaintiff and a review of Plaintiff's earlier radiological studies, Dr. Garcia diagnosed Plaintiff with: "C5-6 disk herniation on the right which is mild to moderate in size with mild foraminal stenosis without significant spinal stenosis; possible malalignment of C1 on C2 and C2 on C3 in a patient with multiple congenital bony abnormalities; and thoracic scoliosis." (Tr. 128). Dr. Garcia recommended Plaintiff undergo physical therapy with cervical traction. Id. He noted if physical therapy does not help, an anterior cervical fusion at C5-6 may be beneficial, although it may not produce a dramatic reduction in Plaintiff's perception of pain. Id. Finally, he opined Plaintiff should consider surgery at C5-6 prior to upper cervical spine surgery due to the significant limitations of range of motion the latter would create in the cervical spine. Id.

In January 2003, Plaintiff went to St. Vincent's Medical Center's emergency room due to severe neck pain. He was diagnosed and discharged with chronic neck pain. (Tr. 130-132). Also in January 2003, Plaintiff began seeing Dr. Ismail D. Salahi at the Metropolitan Pain Management Center, Inc. (Tr. 143-46). During his Initial History and Physical, Plaintiff complained of spine and neck pain, as well as pain in both arms and legs. Dr. Salahi drafted a letter on January 24, 2003, in which he stated:

> Plaintiff's "multiple diagnostic studies have revealed significant scoliosis and degenerative changes consistent with a much older person. Unfortunately, he is not a surgical candidate because of multiple pain complaints and he cannot perform gainful employment secondary to severe pain. I believe that this renders him permanently and totally disabled for many type [sic] of reasonable gainful employment.

(Tr. 204). Plaintiff returned to Dr. Salahi's office on February 12, 2003, to discuss the results of his total body scan which showed scoliosis. (Tr. 142). Dr. Salahi noted that Plaintiff was considering a cervical spinal fusion. He diagnosed Plaintiff with cervical herniated nucleus pulposus and thoracic-lumbar scoliosis. Id.

In a letter dated February 7, 2003, Susie Irvin, ARNP, stated that Plaintiff began treatment at Hilliard Medical Center on November 12, 2002. (Tr. 203). She opined that because of Plaintiff's long history of debilitating medical problems, he would not be able to perform gainful employment and Hilliard Medical Center deemed him permanently disabled. Id. There are, however, no medical records from Hilliard Medical Center.

On May 25, 2003, Plaintiff was admitted to the emergency room at Shands, Jacksonville, where he complained of back pain and was diagnosed with low back pain with radiculopathy. (Tr. 147-151). The Jax Fire Rescue notes show that Plaintiff's pain started with a sudden onset and he immediately lost motor control. (Tr. 149). They also noted Plaintiff used a walker to ambulate. Id.

In March 2004, Plaintiff again underwent evaluation and radiological testing at Shands, Jacksonville; this time, however, he checked in as a patient after falling while walking to his car. (Tr. 160-182). He claimed he was unable to walk. Plaintiff was admitted for acute neck pain and back pain with history of chronic back and neck pain. (Tr. 162). In Plaintiff's discharge summary, Dr. Azita Zadeh noted Plaintiff had a history

5

of degenerative joint disease in spine, scoliosis, and spinal fusion. Id. Throughout the course of his stay at Shands, Plaintiff was admitted and placed on pain medication –Toradol, Valium, and Naproxen – he also underwent physical and occupational therapy evaluations, and a neurosurgery consult. Id. Neurosurgery had previously seen Plaintiff and they repeated x-rays and his lumbar and cervical MRIs. Id. The x-rays showed no changes compared to a January 1, 2004 study. The MRI showed mild changes of degenerative disease with right paracentral bulging primarily at C5 and C6 without any evidence of cord compression with scoliosis and incomplete segmentation of right vertebral bodies at C7 and T1 and T3-T4. Id.

Neurosurgery recommended that there was no surgical intervention which could be done at this point, but Plaintiff should have a pain management consult. Id. The physical therapists noted Plaintiff was able to care for himself and thus, able to be discharged; however, they also recommended Plaintiff have physical therapy, occupational therapy, and pain management. Id. Plaintiff was discharged and told to follow up with his primary care doctor. Id. His diagnosis was cervicalgia; lumbago (low back pain); scoliosis (& kyphoscoliosis), idiopathic; post procedural arthrodesis status; depressive disorder, not elsewhere classified; spina bifida, without mention of hydrocephalus, unspecified region; cervical spondylosis, without myelopathy; and malaise and fatigue. (Doc. 161).

From June through August 2004, Plaintiff was treated with pain injections by Dr. Dimmitt at Shands. On August 9, 2004, Dr. Dimmitt opined that based on medical findings, Plaintiff was limited to performing less than Sedentary Work. (T. 201). Dr. Dimmitt also completed an application for Plaintiff to obtain a disabled person parking

permit and stated Plaintiff was unable to walk without the use of or assistance from a brace, cane, crutch, prosthetic device or other assistive device, or without assistance from another person.  (Tr. 202).

In January and June of 2003, two non-examining state agency physicians completed physical residual functional capacity ("PRFC") assessments on Plaintiff.  (Tr. 134-141; 152-159).  In January 2003, Dr. Donald Morford opined Plaintiff could: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about 6 hours in an 8 hour workday; sit about 6 hours in an 8 hour workday; and push and/or pull an unlimited amount.   (Tr. 135).  He noted Plaintiff was limited in reaching in all directions (Tr. 137), he could occasionally climb, crouch and crawl (Tr. 136), and Plaintiff should avoid hazards (Tr. 138).

In June of 2003, a second state agency physician felt Plaintiff was somewhat more limited.  He opined Plaintiff could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8 hour workday; sit about 6 hours in an 8 hour workday; and push and/or pull an unlimited amount.   (Tr. 153).   He also found Plaintiff's ability to reach in all directions limited (Tr. 155), and Plaintiff was occasionally limited by all postural positions except balancing (Tr. 154).  He too noted Plaintiff should avoid hazards.  (Tr. 156).

### C.   Summary of the ALJ's Decision

Plaintiff is entitled to disability benefits when he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The ALJ

7

must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if Plaintiff is working at a substantial gainful activity, he is not disabled.  29 C.F.R. § 404.1520(b).  Second, if Plaintiff does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if Plaintiff's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if Plaintiff's impairments do not prevent him from doing past relevant work, he is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if Plaintiff's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.  20 C.F.R. § 404.1520(f).  Plaintiff bears the burden of persuasion through step four, while at step five, the burden shifts to the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287 n.5 (1987).

In the instant case, the ALJ determined Plaintiff met the nondisability requirements of the Act and was insured for benefits through December 31, 2007.  (Tr. 12, 18).  Although the ALJ skipped the first step in evaluating Plaintiff's disability, the Court necessarily infers the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date of his disability because the ALJ jumped straight to step two of the analysis.  At steps two and three, the ALJ found Plaintiff had:

> cervicalgia; low back pain, cervical spondylosis without myelopathy; cervical herniated nucleus pulposus; thoracic-lumbar scoliosis C5-6 disc herniation on the right, mild to moderate in size with mild foraminal stenosis without significant spinal stenosis; possible malalignment of C1 and

> C2 on C3; multiple congenital bony abnormalities; and
> history of spinal fusion in 1978, impairments that are 'severe'
> within the meaning of the Regulations but not 'severe'
> enough to meet or medically equal, either singly or in
> combination to one of the impairments listed in Appendix 1,
> Subpart P, Regulations No. 4.

(Tr. 15, 18). In analyzing Plaintiff's residual functional capacity ("RFC"), the ALJ considered the medical evidence, medical opinions from acceptable medical sources, as well as Plaintiff's testimony during the hearing. In making his determination, the ALJ found Plaintiff's testimony regarding his pain and resulting limitations not fully credible. He also rejected the medical opinions of Plaintiff's examining physicians after finding they were not entitled to much weight. (Tr. 15-16). The ALJ then concluded Plaintiff retained the RFC to:

> lift and/or carry 20 pounds occasionally and 10 pounds
> frequently. He can stand and/or walk 6 hours and sit 6 hours
> in an 8-hour workday.

(Tr. 17, 19). He further noted that while Plaintiff retained the residual functional capacity to perform a significant range of light work, Plaintiff's exertional and/or non-exertional limitations *do not allow him to perform the full range of light work.* (Tr. 17-19) (emphasis added).

At step four, the ALJ determined Plaintiff was unable to perform any of his past relevant work. (Tr. 19). At the hearing, the ALJ forewent the opinion of a vocational expert and instead relied on the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations in determining Plaintiff is capable of making a successful adjustment to perform a significant number of jobs in the national economy. (Tr. 18-19). As such, the ALJ determined Plaintiff was not disabled within the meaning of the

9

Social Security Act. Id.

## III.  THE STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

**IV. ANALYSIS**

Plaintiff argues three issues on appeal. First, Plaintiff argues the ALJ erred by not developing the medical opinions from the treating physicians. (Doc. 15, p. 3). Second, Plaintiff argues the ALJ erred by not eliciting testimony from a Vocational Expert ("VE"). Id. at 5. Finally, Plaintiff argues the ALJ committed error by failing to fully and fairly develop the record by not ordering a consultative examination. Id. at 7-8.

Because the Court finds Plaintiff's second argument persuasive, the Court will address this issue first. The Court will then address Plaintiff's remaining two arguments contemporaneously, as they essentially require analysis of only one issue: whether the ALJ properly developed the record.

    **A.**    <u>**Whether the ALJ erred by failing to elicit testimony from a VE**</u>**?**

Initially in his Decision, the ALJ opined Plaintiff "retains the residual functional capacity to perform light work. He can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk 6 hours and sit 6 hours in an 8-hour workday." (Tr. 17). Later in his decision, however, the ALJ qualified this statement by opining that Plaintiff's "ability to perform all or substantially all of the requirements of light work is impeded by additional exertional and/or non-exertional limitations." (Tr. 18). Also, in his "Findings," the ALJ stated "[a]lthough [Plaintiff's] exertional limitations do not allow him to perform the full range of light work, using Medical-vocational Rule 202.18 as a framework for the decision-making, there are a significant number of jobs in the national economy that he could perform." (Tr. 19). Notably, in the hearing, the ALJ did not elicit vocational testimony from an expert in determining whether Plaintiff could perform a significant number of jobs in the national economy.

Plaintiff argues the ALJ's failure to consult a VE was error because the ALJ has a duty to elicit vocational testimony in a case such as this – where an ALJ has found a claimant cannot perform a full range of work in a given work classification – in order to determine the appropriate effect Plaintiff's limitations may have on his ability to work. (Doc. 15, p. 5).  The Commissioner, alternatively, argues the ALJ "cited no nonexertional limitations which would preclude application of the grids absent VE testimony." (Doc. 16, p. 8).  Further, the Commissioner argues the ALJ determined Plaintiff could perform a "significant range of light work."  Id.  The Commissioner then states the ALJ is only required to elicit VE testimony when a plaintiff's limitations are severe enough to prevent a wide range of gainful employment at the designated level. Id. at 9.  Here, the Commissioner asserts the ALJ determined Plaintiff has symptoms and limitations which do not prevent him from working and thus, the ALJ did not err in choosing not elicit VE testimony.  Id.

As stated earlier, the burden shifts to the ALJ on step five of the disability analysis.  The ALJ has a duty to develop a full and fair record regarding the vocational opportunities for Plaintiff.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  In some circumstances, the ALJ may rely on the grids in lieu of vocational testimony.  Id. at 1202.  "Exclusive reliance on the grids is not appropriate either when [Plaintiff] is unable to perform a full range of work at a given functional level or when [Plaintiff] has non-exertional impairments that significantly limit basic work skills." Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

In the instant case, the Court admits it is somewhat confused by the ALJ's opinion.  At first glance it appeared the ALJ found Plaintiff capable of performing light

12

work with no limitations. After reading the ALJ's entire opinion, however, the Court interpreted it as determining Plaintiff can perform a significant range of light work but not the full range of light work. In fact, the ALJ's statement that Plaintiff's "ability to perform all or substantially all of the requirements of light work is impeded by additional exertional and/or non-exertional limitations" clearly demonstrates the ALJ's conclusion that Plaintiff is not capable of performing the full range of light work. Conspicuously absent from the ALJ's opinion, however, is what additional exertional and/or non-exertional limitations the ALJ is referring to and how such limitations impede Plaintiff's ability to perform light work. Regardless, the ALJ clearly states Plaintiff cannot perform the full range of light work. Consequently, the ALJ erred in failing to elicit testimony from a VE.

As an aside, the Court notes that in its memorandum the Commissioner details how the ALJ articulated sufficient reasons for rejecting Plaintiff's subjective complaints of pain. The Court, however, will not embark on a pain analysis in this case for two reasons. First, Plaintiff does not argue the ALJ erred in rejecting his complaints of pain. Second, the Court finds the ALJ erred in failing to elicit VE testimony after explicitly finding Plaintiff incapable of performing a full range of light work – and failing to set forth any finding with respect to Plaintiff's ability to perform sedentary work -- irrespective of his findings with regard to Plaintiff's pain.

The Court would, however, like to point out that the ALJ essentially ignored the entire issue surrounding Plaintiff's pain, other than wholly rejecting Plaintiff's credibility as to all of his limitations. (Tr. 15-16 ,19). A review of the record shows significant documentation of Plaintiff's chronic pain and thus, the Court believes some discussion

regarding the extent of Plaintiff's pain, by the ALJ, is necessary. Additionally, the ALJ fails to mention Plaintiff's claim that he required an assistive device to walk effectively.[2] This fact is also worthy of discussion in assessing Plaintiff's limitations and how they affect his ability to work. As such, on remand, in addition to eliciting the testimony of a VE, the ALJ should also specifically discuss his findings with respect to the extent of Plaintiff's pain limitations, Plaintiff's ambulatory limitations, as well as any other limitations set forth by Plaintiff which may affect his ability to work.

      B.      **<u>Whether the ALJ erred by failing to properly develop the record</u>?**

During the hearing, the ALJ mentioned that medical records appeared to be missing from the record. (Tr. 208). After the Plaintiff testified that he went to the doctor on a frequent basis from the time of his alleged onset through the present, the ALJ gave the Plaintiff an additional thirty days after the hearing to submit any medical evidence that was not yet in the record. (Tr. 16, 209). Apparently, Plaintiff never submitted any additional records.

Now, Plaintiff claims the ALJ had a duty to properly develop the record. He claims the ALJ failed to do so and in light of the fact that several treating physicians opined that Plaintiff is unable to work, the ALJ should have sought additional information from Plaintiff's treating physicians to properly develop the medical evidence. (Doc. 15, p. 3-4). Additionally, Plaintiff argues the ALJ's duty to develop a full and fair record includes a duty of the ALJ to schedule a consultative exam. Id. at 7-8. In response, the

---

[2] Plaintiff's claim is supported by the fact that Dr. Dimmitt completed an application for Plaintiff to obtain a disability parking permit which specifically stated Plaintiff was not able to walk without an assistive device or assistance from another person. (Tr. 202).

14

Commissioner argues it is Plaintiff's burden to provide a complete medical record and if he fails to do so, the ALJ will make a decision based on the evidence available. (Doc. 16, p. 7). Plaintiff further argues the ALJ was not required to order a consultative exam because there was sufficient information in the record for the ALJ to render his decision. Id. at 12.

Both parties are correct in their restatements of the law. Indeed, it is Plaintiff's responsibility to "provide medical evidence showing. . .an impairment(s) and how severe it is." 20 C.F.R. § 404.1512(c). On the other hand, the ALJ also has a duty to fully and fairly develop the record. Welch v. Bowen, 854 F.2d 436, 438 (11th Cir. 1988). The ALJ's duty to develop the record is set forth in the regulations. Specifically, they provide, *inter alia*:

> (d). *Our responsibility.* Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application. . . . We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.
>
> (e). *Recontacting medial sources.* When the evidence we receive from your treating physician . . . or other medial source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
>
> (1) We will first recontact your treating physician . . or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medial source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. . . .
>
> (2)(f) *Need for consultative examination.* If the information we need is not readily available form the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will

> ask you to attend one or more consultative examinations at our expense. Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources. . . .

20 C.F.R. §416.912.

Thus, the ALJ's duty to recontact Plaintiff's physicians hinges on a finding by him that the medical evidence is inadequate. Also, the ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917. In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. Holladay v. Bowen, 848 F.2d 1206, 1210 (11th Cir. 1988).

This case presents an interesting factual scenario because the ALJ stated there are gaps in the record and in fact, he stated he would not render a decision until he had the missing medical records. It is unclear whether the ALJ made any effort to assist Plaintiff in obtaining the medical reports that are allegedly missing. Nor is it clear whether additional medical reports even exist. Because the ALJ has a duty to develop Plaintiff's complete medical history for at least the 12 months preceding the date he filed his application – November 21, 2002 – on remand, the ALJ should take all necessary steps to fully develop the record. He should set forth any efforts he has made to obtain records and his belief as to whether additional records are available. Also, he should make it clear whether or not he finds the existing medical records adequate for evaluating whether Plaintiff has a disability. If not, the ALJ should take appropriate

steps to either recontact Plaintiff's physicians or schedule a consultative exam for Plaintiff. The Court notes that a likelihood of prejudice may arise if there is an evidentiary gap that "the claimant contends supports [his] allegations of disability." Johnson v. Barnhart, 138 F.App'x. 186, 189 (11th Cir. 2005) (quoting Brown v. Shalala, 44 F.3d 931, 936 (11th Cir. 1995)).

## V. CONCLUSION

For the foregoing reasons, the undersigned believes the Commissioner's decision is not supported by substantial evidence, nor decided according to the proper legal standards, and is therefore **REVERSED** and **REMANDED** pursuant to sentence four, 42 U.S.C. 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this  13th  day of July, 2006.

*Monte C. Richardson*
MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record